## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| THOMAS O. MATULA JR.,<br>individually and as representative of a<br>class of participants and beneficiaries<br>on behalf of the Wells Fargo &<br>Company 401(k) Plan,<br><br>                Plaintiff,<br><br>      v.<br><br>WELLS FARGO & COMPANY; HUMAN<br>RESOURCES COMMITTEE OF THE<br>BOARD OF DIRECTORS OF WELLS<br>FARGO; WELLS FARGO EMPLOYEE<br>BENEFIT REVIEW COMMITTEE;<br>and DOES 1-10, inclusive,<br><br>                Defendants. | Case No. 0:24-cv-03703-JRT-TNL |

## REPLY IN SUPPORT OF DEFENDANTS' MOTION
## TO DISMISS THE CLASS ACTION COMPLAINT

## <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT ........................................................................ 1

ARGUMENT .................................................................................................... 3

I.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE MATULA
      LACKS ARTICLE III STANDING ................................................... 3

      A.    Matula Does Not Have Standing On Account Of Any Purported Plan
            Losses ................................................................................................ 3

      B.    Matula Cannot Manufacture Standing By Interpreting "Expenses of the
            Plan" To Include Individual Service Or Investment Fees......................... 6

      C.    Matula Cannot Manufacture Standing By Interpreting "Corrective
            Adjustment" To Include Allocations In An "Equitable Manner"............. 9

II.   MATULA'S CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE
      A PLAUSIBLE CLAIM FOR RELIEF ........................................... 10

      A.    The Complaint Fails To State A Claim For Breach Of Fiduciary Duty . 11

      B.    The Complaint Fails To State A Claim For Violation Of  ERISA's Anti-
            Inurement Clause ............................................................................ 13

      C.    The Complaint Fails To State A Prohibited Transaction Claim ............. 14

      D.    The Complaint Fails To State A Duty to Monitor Claim ...................... 15

III.  MATULA'S CLAIMS ARE BARRED BY A RELEASE............................... 16

IV.   MATULA'S REQUEST FOR LEAVE TO AMEND SHOULD BE DENIED 18

CONCLUSION ............................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Angevine v. Anheuser-Busch Companies Pension Plan*,
    646 F.3d 1034 (8th Cir. 2011) ........................................................... 9

*Barragan v. Honeywell Int'l, Inc.*, No. 24-cv-4529 (ECF No. 70)
    (D.N.J. Dec. 19, 2024) ........................................................... *passim*

*Brown v. Medtronic, Inc.*,
    628 F.3d 451 (8th Cir. 2010) ........................................................... 4

*Conkright v. Frommert*,
    559 U.S. 506 (2010) ........................................................... 8-9

*Davis v. Washington Univ. in St. Louis*,
    960 F.3d 478 (8th Cir. 2020) ........................................................... 6, 8

*Dimou v. Thermo Fisher Sci. Inc.*,
    2024 WL 4508450 (S.D. Cal. Sept. 19, 2024) ........................................................... *passim*

*Fritton v. Taylor Corp.*,
    2022 WL 17584416 (D. Minn. Dec. 12, 2022) ........................................................... 5, 7

*Howell v. Motorola, Inc.*,
    633 F.3d 552 (7th Cir. 2011) ........................................................... 17

*Hughes v. Northwestern Univ.*,
    595 U.S. 170 (2022) ........................................................... 9

*Hutchins v. HP Inc.*,
    2024 WL 3049456 (N.D. Cal. June 17, 2024) ........................................................... *passim*

*Innis v. Bankers Tr. Co. of S.D.*,
    2019 WL 2714509 (S.D. Iowa Apr. 30, 2019) ........................................................... 17, 18

*Lockheed Corp. v. Spink*,
    517 U.S. 882 (1996) ........................................................... 15

*Matousek v. MidAmerican Energy Co.*,
    51 F.4th 274 (8th Cir. 2022) ........................................................... 5, 7, 18

*McManus v. Clorox Co.*,
2024 WL 4944363 (N.D. Cal. Nov. 1, 2024) ........................................................ *passim*

*MM & S Fin., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*,
364 F.3d 908 (8th Cir. 2004) ..................................................................... 18

*Naylor v. BAE Sys., Inc.*,
2024 WL 4112322 (E.D. Va. Sept. 5, 2024) ........................................................ *passim*

*Parmer v. Land O'Lakes, Inc.*,
518 F. Supp. 3d 1293 (D. Minn. 2021) ..................................................... 5, 8

*Perez-Cruet v. Qualcomm Inc.*,
2024 WL 2702207 (S.D. Cal. May 24, 2024) ............................................ 11, 13, 15

*Rodriguez v. Intuit Inc.*,
2024 WL 3755367 (N.D. Cal. Aug. 12, 2024) ..................................... 11, 12, 13, 15

*Russell v. Harman Int'l Indus., Inc.*,
945 F. Supp. 2d 68 (D.D.C. 2013),
*aff'd*, 773 F.3d 253 (D.C. Cir. 2014) ................................................... 17-18

*Schave v. CentraCare Health Sys.*,
2023 WL 1071606 (D. Minn. 2023) ............................................................ 5

*Spizman v. BCBSM, Inc.*,
855 F.3d 924 (8th Cir. 2017) ............................................................. 8, 10

*Stanley v. George Washington Univ.*,
394 F. Supp. 3d 97 (D.D.C. 2019),
*aff'd*, 801 F. App'x 792 (D.C. Cir. 2020) ............................................ 16, 17

*Taveras v. UBS AG*,
612 F. App'x 27 (2d Cir. 2015) .............................................................. 4

*Thole v. U.S. Bank N.A.*,
590 U.S. 538 (2020) ..................................................................... 4, 5

**STATUTES AND OTHER AUTHORITIES**

88 Fed. Reg. 12282, 12283 (Feb. 27, 2023) ................................................. 12

Rev. Ruling 71-313,
1971-2 C.B. 203, 1971 WL 26693 (1971) ................................................. 12

DOL, Adv. Op. 79-56A, 1979 WL 7031 (Aug. 9, 1979) .................................... 12

*A Look at 401(k) Plan Fees* (Sept. 2019),
  https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-
  activities/resource-center/publications/401k-plan-fees.pdf ........................................... 6

D. Minn. L. R. 15.1(b) ........................................................................................ 18

ERISA § 403(c)(1), 29 U.S.C. 1103(c)(1) ......................................................... 13

ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) ..................................... 11, 12

ERISA § 406, 29 U.S.C. § 1106 ................................................................... 14, 15

ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) ...................................................... 17

Fed. R. Civ. P. 12(b)(6) ..................................................................................... 10

*Correct*, Webster's Dictionary (2024),
  www.merriam-webster.com/dictionary/correct ........................................... 10

## PRELIMINARY STATEMENT

Matula does not dispute that he received all of the employer contributions due to him under the Plan and any investment earnings thereon. Nor does he dispute that Wells Fargo pays all of the Plan's administrative expenses and that none have been deducted from his Plan account. Matula nevertheless advances three arguments as to how he allegedly has been injured by the use of forfeitures to offset future employer contributions, none of which cure the deficiency in his Article III standing.

Matula first contends that the Plan's alleged losses grant him standing, but that argument ignores controlling precedent holding that plan losses are insufficient to afford participants standing unless their individual benefits have been reduced and Matula's have not. Next, Matula argues that he has been injured by the failure to allocate forfeitures to the "expenses of the Plan," which he misconstrues to include fees for optional services elected by participants and investment fees paid in connection with participants' individual investment elections. But he does not claim to have paid for any optional services and, moreover, none of these fees are "expenses *of the Plan*." Lastly, Matula posits that he had, and lost, a right to have his benefits increased with forfeitures under section 6.5 of the Plan's "corrective adjustment" clause. This argument fares no better; it is based on a tortured construction of this Plan provision, which plainly limits the use of forfeitures to correct administrative errors. Because Matula's attempts to establish Article III standing are unsustainable, his Complaint should be dismissed.

If this Court concludes that Matula has not made the requisite Article III showing, it need not examine the plausibility of his claims. None of the arguments Matula

propounds in alleged support of these claims are, in any event, viable. In fact, to date, five courts have rejected the same arguments he advances here. *Hutchins v. HP Inc.*, 2024 WL 3049456 (N.D. Cal. June 17, 2024); *Naylor v. BAE Sys., Inc.*, 2024 WL 4112322 (E.D. Va. Sept. 5, 2024); *Dimou v. Thermo Fisher Sci. Inc.*, 2024 WL 4508450 (S.D. Cal. Sept. 19, 2024); *McManus v. Clorox Co.*, 2024 WL 4944363 (N.D. Cal. Nov. 1, 2024); *Barragan v. Honeywell Int'l, Inc.*, 2024 WL 5165330 (D.N.J. Dec. 19, 2024). Notably, under this growing body of case law, Matula's claims would be insufficient even if this Court were to adopt his strained construction of the Plan (which it should not) and conclude that the Plan administrator had a choice to use forfeitures for individual participant expenses.

Matula's argument that it is a fiduciary breach to use forfeitures to offset contributions ignores that the Plan administrator had no discretion to allocate forfeitures differently and, in any event, runs afoul of existing and proposed Treasury regulations approving the practice. His characterization of the use of forfeitures as forgiveness of a "debt" in connection with his anti-inurement claim is misplaced since an employer's future contributions are not "debts" due to a plan. And he has failed to offer any authority establishing that an intra-plan transfer designed to fund benefits constitutes a prohibited transaction under ERISA.

Matula also has not made any arguments that would undo the broad release of claims he signed in 2023 upon leaving employment at Wells Fargo. Matula's only arguments are that the release does not mention ERISA and he could not have released the Plan's claims, which he asserts derivatively. Both arguments have been soundly

rejected by other courts. The law extends releases of "any claims" to ERISA claims, even without any reference to the statute. And it precludes participants who waive their right to sue from pursuing a plan's claims in a representative action, while leaving intact any claims the plan may have.

In short, Matula's Complaint should be dismissed without leave to replead because he lacks Article III standing to assert his claims and has failed to state a plausible claim.

## ARGUMENT

## I.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE MATULA LACKS ARTICLE III STANDING.

In an effort to conjure up a cognizable Article III injury that is redressable by the relief sought in this action, Matula advances three arguments, the first of which is based on a misreading of the law, and the other two on a misreading of the Plan. All three should be rejected.

### A.    Matula Does Not Have Standing On Account Of Any Purported Plan Losses.

Matula's contention that losses to the Plan are sufficient to confer him with standing (ECF No. 46 at 4-7) fails because Matula nowhere alleges that the Plan (or he) has suffered any losses; indeed, Matula does not dispute that the Plan received all required employer contributions and it did not advance any money for Plan expenses. But even if, as Matula argues (*id*. at 6), the Plan would have received $2 million *more* in

contributions but for the offset (which it would not have),[1] that does not mean that Matula has suffered a redressable injury because this additional amount would not have translated into more than a 6% matching contribution to him. Specifically, while Matula's account balance may fluctuate and even increase with investment earnings, the amount Wells Fargo is required to contribute for him is defined and fixed by the Plan document. Under *Thole v. U.S. Bank N.A.*, 590 U.S. 538 (2020) and the numerous other authorities cited by Defendants in their Moving Brief, a plaintiff lacks Article III standing where, as here, his benefit would remain the same even if the plan recovered any losses. (ECF No. 38 at 10-15.)

Matula's only retort is that the Plan is a defined contribution plan, whereas the plans in the cases cited by Defendants are defined benefit or health plans. (ECF No. 46 at 12-13.) Matula is wrong. Defendants' Moving Brief cited *Taveras v. UBS AG*, wherein the Second Circuit concluded that losses experienced by a 401(k) defined contribution plan (like the Plan here) were insufficient to confer standing on an individual participant who did not suffer losses. 612 F. App'x 27, 29 (2d Cir. 2015). (ECF No. 38 at 10-11.) And many other courts have similarly applied the principles of Article III standing articulated in *Thole* to defined contribution plans. *See, e.g.*, *Brown v. Medtronic, Inc.*, 628 F.3d 451, 458 (8th Cir. 2010) (concluding that defined contribution plan plaintiff lacked

---

[1] Section 5.1(d) of the Plan requires Wells Fargo to contribute only such amounts as necessary to meet its matching obligation "after taking into account credits under Sec. 6.5[.]" (ECF No. 40-2 at § 5.1(d)).

standing); *Fritton v. Taylor Corp.*, 2022 WL 17584416, at *4-5 (D. Minn. Dec. 12, 2022) (same) (Tostrud, J.).

That *Thole* distinguished claims involving defined contribution plans from defined benefit plans is irrelevant. The Court did so in the context of a claim for breach of fiduciary duty for imprudent investments where plan losses inevitably reduce the value of participants' accounts. *See Thole*, 590 U.S. at 544. The Court accordingly differentiated those circumstances from the facts presented in *Thole*, wherein the investment losses suffered by the plan did not result in a loss of benefits to individual participants. Here, as in *Thole*, Matula has not experienced any reduction in his benefit resulting from an alleged misuse of forfeitures, since he has received all of the contributions to which he is entitled under the Plan and has no contractual right to the forfeitures in question.

The cases cited by Matula (ECF No. 46 at 5-7) are not to the contrary. *Matousek v. MidAmerican Energy Co*., 51 F.4th 274, 277 (8th Cir. 2022) did not address standing. Both *Parmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d 1293, 1301 (D. Minn. 2021) and *Schave v. CentraCare Health Sys*., 2023 WL 1071606, at *2 (D. Minn. 2023) concluded that the plaintiffs had Article III standing to challenge the reasonableness of the plan's general administrative expenses and investment fees that, in accordance with the plan, were deducted from their accounts and thus reduced their benefit. Here, Matula has not paid for any administrative expenses and is not challenging the amount of any investment fees; instead, he is asking for a windfall.

**B.      Matula Cannot Manufacture Standing By Interpreting "Expenses of the Plan" To Include Individual Service Or Investment Fees.**

Matula's position that "expenses of the Plan" include fees charged to participants' accounts for optional services and investment management does not cure his standing deficiency.  (ECF No. 46 at 7-9.)[2]

The U.S. Department of Labor has explained that there are three categories of 401(k) plan fees:

- "*Plan administration fees*" for the day-to-day operation of the plan, such as plan recordkeeping, accounting, legal and trustee services, that are "basic and necessary" for administering the plan as a whole.

- "*Individual service fees*" for optional features offered under an individual account plan (*e.g.*, qualified domestic relations orders ("QDROs"), loans, wire transfers) that are charged to those participants who take advantage of the services.

- "*Investment fees*" charged as a deduction from investment returns to cover investment management services (*e.g.*, management, research and monitoring, sales charges).

*A Look at 401(k) Plan Fees*, at 3 (Sept. 2019),

https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/401k-plan-fees.pdf. *See Davis v. Washington Univ. in St. Louis*, 960

---

[2] Whether this Court addresses Matula's interpretational arguments in the context of its assessment of his Article III standing or on the merits, *see* Part II, *infra*, the result is the same: his claims fail because the Plan lawfully requires that forfeitures be used to offset future employer contributions and he has no entitlement to them to reduce any of his personal expenses or to increase his benefits.

F.3d 478, 482 (8th Cir. 2020) (citing DOL publication and drawing distinction between investment fees and plan administration fees).

As a threshold matter, Matula lacks standing to pursue any claims pertaining to "individual service fees," because he does not allege that he ever paid for such services. *See, e.g.*, *Fritton*, 2022 WL 17584416, at *4-5 (dismissing claim for lack of standing where plaintiffs did not allege that they invested in investment funds underlying their claims).

But even if Matula had taken advantage of any optional services, his position fails because, as the cases he cites confirm (ECF No. 46 at 5-7), "individual services fees" are not necessary to run the Plan; they are expenses incurred by individual participants for their individual "Accounts," which the Plan document defines separately as "a Participant's, Beneficiary's or Alternate Payee's interest in the Trust Fund" (ECF No. 40-2 at § 2.1); *see Matousek*, 51 F.4th at 279 (distinguishing between plan administration fees and fees for participant-initiated services). Indeed, section 10.12(e) of the Plan states that fees associated with QDROs "shall be charged against the Accounts of the Participant and/or the Alternate Payee." And section 8.9(d) of the Plan requires that fees for individual investment advice will be paid by the participant from the participant's "Account."[3]

---

[3] The fact that Wells Fargo gratuitously pays from *corporate assets* for participant-elected loans does not mean, as Matula contends (ECF No. 46 at 8), that forfeitures, which Matula contends are *Plan assets*, must be used to pay for other individual service fees.

The same rationale applies to "investment fees," which Matula's own cases recognize cover the operating costs for the investment funds a participant selects; not those of the Plan. *See Parmer*, 518 F. Supp. 3d at 1301 (ECF No. 46 at 6-7) (drawing distinction between plan administrative expenses and investment fees); *Davis*, 960 F.3d at 482 (explaining that "investment-management fees . . . cover the operating costs of the individual investments in a participant's portfolio"). In fact, Matula's own Account statement draws the distinction when it explains that his investment "[r]eturns reflect deduction of fund operating expenses. Your Plan may also assess administrative fees which would reduce the results shown above." (ECF No. 47, Ex. 1 at 5.) Investment fees are charged to investors in that fund. Matula cannot benefit from his substantial Account balance, which he acknowledges exceeds $2.3 million, without paying the expenses for the investments he selected. (*Id*. at 1.)[4]

Furthermore, interpreting a plan to shift the cost of individual service and investment fees to an employer would most certainly deter employers from sponsoring defined contribution plans.[5] As the Supreme Court emphasized in *Conkright v.*

---

[4] Matula's reliance on the principle of *contra proferentum* to have this Court adopt his construction is misplaced since there is nothing ambiguous about section 6.5 of the Plan and, as the case he cites confirms (ECF No. 46 at 8-9), the principle is applied as a last resort to construe insurance policies only where ambiguities persist after considering extrinsic evidence. *See also Spizman v. BCBSM, Inc*., 855 F.3d 924, 927 (8th Cir. 2017) (declining to apply *contra proferentum* to interpret ERISA plan).

[5] As the cases cited by Matula acknowledge (ECF No. 46 at 5-7), courts have seen a flood of ERISA cases where participants have complained about investment fees charged to their accounts and that their plans' fiduciaries should have offered investments with lower fees. In none of these cases have plaintiffs ever argued—let alone any court concluded—that the fees were part of a plan's general administrative expenses and

*Frommert*, "ERISA represents a 'careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans' . . . Congress sought 'to create a system that is [not] so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [ERISA] plans in the first place.'" 559 U.S. 506, 517 (2010) (alteration in original) (citations omitted). This Court should construe the Plan consistent with—not contrary to—ERISA's goals and purpose.

In short, Matula's efforts to manufacture an ambiguity where none exists cannot serve as a basis for establishing Article III standing. If, in fact, there were a bona fide dispute about the meaning of a Plan term and his entitlement to a benefit, Matula was required to submit an administrative claim consistent with the Plan's claim procedures (ECF No. 40-2 at § 12.10) and exhaust that process before filing this suit. *See, e.g.*, *Angevine v. Anheuser-Busch Companies Pension Plan*, 646 F.3d 1034, 1037 (8th Cir. 2011) (emphasizing importance of exhaustion to allow plan administrator to interpret plan and ensure consistent treatment of claims). The fact that Matula does not allege that he has done so (which he has not) further shows the absurdity of his argument.

### C.    Matula Cannot Manufacture Standing By Interpreting "Corrective Adjustment" To Include Allocations In An "Equitable Manner."

Lastly, Matula contends that because section 6.5 of the Plan provides Defendants with discretion to use forfeited funds to make "corrective adjustments" that this somehow

---

should have been paid by anyone other than participants. *See, e.g.*, *Hughes v. Northwestern Univ.*, 595 U.S. 170 (2022).

means that forfeited funds should be allocated to participants in an "equitable manner." (ECF No. 46 at 10.) There is no plausible interpretation of "corrective adjustment" that would permit such a windfall. Webster's dictionary, which courts routinely consult when construing ERISA plans, defines "corrective" as "intended to correct," which is itself defined to mean "to make or set right" as in to "correct an error." www.merriam-webster.com/dictionary/correct. *See Spizman v. BCBSM, Inc.*, 855 F.3d 924, 927 (8th Cir. 2017) (consulting Webster's Dictionary when interpreting ERISA plan). And even the Cambridge Dictionary, which Matula relies on (ECF No. 46 at 10), defines "corrective" as "intended to improve something *or make it right[,]*" thus presuming an error necessitating correction. Matula's attempt to fabricate an ambiguity over the meaning of "corrective adjustment" is groundless and should be rejected for the same reasons as his attempt to interpret "expenses of the Plan." *See* Part I.B., *supra*.

## II.    MATULA'S CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A PLAUSIBLE CLAIM FOR RELIEF.

In addition to lacking standing, Matula's claims lack plausibility and should be dismissed pursuant to Rule 12(b)(6) because there is nothing unlawful about the use of forfeitures to fund employer contributions, particularly where, as here, the Plan *requires* that they be used in this fashion. (ECF No. 38 at 16-26.) In fact, even if this Court concluded that the Plan permitted forfeitures to be used for individual service and investment management fees and/or as a "corrective adjustment" (which it should not), Matula's claims should still be dismissed because there is nothing in the Plan or ERISA that requires Defendants to prioritize participants' interests over using forfeitures to offset

future employer contributions. (*Id.* at 20-21.) This is why complaints advancing the identical claims were dismissed in *Hutchins*, *Dimou*, *McManus* and *Barragan* even though the defendants in those cases had discretion to use forfeitures toward expenses borne by plan participants. *See also Naylor*, 2024 WL 4112322, at *6 (rejecting claims where plan mandated forfeitures be used to offset employer contributions).

### A.       The Complaint Fails To State A Claim For Breach Of Fiduciary Duty.

As previously discussed, Matula's fiduciary breach claim should be dismissed because the Complaint does not plausibly allege that Defendants (i) acted as fiduciaries, since the Plan leaves no choice on how to allocate forfeitures; or (ii) breached a fiduciary duty, since the use of forfeited employer contributions to fund future employer contributions is required by the Plan and lawful under Treasury regulations. (ECF No. 38 at 18-22.) In response, Matula advances two arguments: (i) the decisions in *Perez-Cruet v. Qualcomm Inc.*, 2024 WL 2702207 (S.D. Cal. May 24, 2024) and *Rodriguez v. Intuit Inc.*, 2024 WL 3755367 (N.D. Cal. Aug. 12, 2024) render his claim viable; and (ii) Defendants' compliance with the written Plan document is not a defense because the Plan terms allegedly violate ERISA's anti-inurement and prohibited transaction provisions. (ECF No. 46 at 13-15.)

To begin with, as Defendants explained in their Moving Brief (ECF No. 38 at 18-22), critically, the plan administrators in the *Qualcomm* and *Intuit* cases, unlike here, had discretion over the allocation of forfeitures. Furthermore, in those cases, plaintiffs' claim was that forfeitures should have been used to reduce plan administrative expenses, which the *Qualcomm* court held was viable under ERISA section 404(a)(1)(A)'s requirement

that fiduciaries use plan assets to "defray[ ] reasonable expenses of administering the plan[.]" 2024 WL 2702207 at *3, 6. Here, Matula is asking that forfeitures cover participants' *individual* expenses, not Plan administrative expenses, but nothing in section 404(a)(1)(A) nor those decisions require that outcome. *Intuit* is additionally irrelevant because, there, plaintiff alleged that forfeitures were allocated to the *wrong category* of employer contributions *in violation of the plan*, 2024 WL 3755367, at *6, 8, 9, which is not an issue here.

Matula's second argument—that following section 6.5 of the Plan is not a shield to liability because it violates ERISA's anti-inurement and prohibited transaction provisions—should be rejected for the reasons discussed below in Parts II.B and II.C. Moreover, as Defendants explained in their Moving Brief, section 6.5 is consonant with the law, including existing and proposed Treasury Department regulations. (ECF No. 38 at 21-22.) Matula's position that these regulations do not extend to profit-sharing plans (ECF No. 46 at 21-22), even if true, is myopic, since the Treasury Department has stated unequivocally that forfeitures may be used to offset employer contributions in profit-sharing plans. Rev. Ruling 71-313, 1971-2 C.B. 203, 1971 WL 26693 (1971); 88 Fed. Reg. 12282, 12283 (Feb. 27, 2023) (proposing regulations that "would *clarify* [1986 rule] that forfeitures arising in *any* defined contribution plan" may offset employer contributions) (emphasis added); *see also* DOL Adv. Op. 79-56A, 1979 WL 7031 (Aug. 9, 1979) (noting use of forfeitures to offset employer contributions in defined contribution plan). In fact, three courts have relied on this regulatory framework to reject the theory that forfeitures must always be used to reduce participant paid plan expenses

rather than to offset employer contributions. *McManus*, 2024 WL 4944363 at *6 (noting that plaintiffs cannot "persuasively explain how the Department of Treasury would now allow forfeitures to be used to reduce employer contributions if such practice breached fiduciary duties"); *Hutchins*, 2024 WL 3049456, at *6-7; *Dimou*, 2024 WL 4508450, at *9. Matula ignores these decisions.

**B.    The Complaint Fails To State A Claim For Violation Of ERISA's Anti-Inurement Clause.**

In their Moving Brief, Defendants sought dismissal of Matula's claim under ERISA section 403(c)(1) on the ground that the forfeitures were kept in the Plan and were used to pay benefits to participants and thus did not "inure" to Wells Fargo's benefit. (ECF No. 38 at 22-24.) Matula's only response is to again rely on *Qualcomm* and *Intuit*, which he claims reasoned that offsetting employer contributions with forfeitures is akin to forgiving an employer "debt" in violation of the anti-inurement rule. (ECF No. 46 at 15-18.)

To date, five courts have surveyed the law surrounding ERISA's anti-inurement requirements and disagreed with the rationale of *Qualcomm* and *Intuit*, reasoning that "anti-inurement claims require a 'removal of plan assets for the benefit of the plan sponsor,'" not a reallocation to pay plan benefits. *McManus*, 2024 WL 4944363, at *7 (citation omitted); *see Hutchins*, 2024 WL 3049456, at *2; *Naylor*, 2024 WL 4112322, at *2; *Dimou*, 2024 WL 4508450, at *5; *Barragan*, 2024 WL 5165330, at *5-6. This is unremarkable, since, for the same reason the practice endorsed by the Treasury

Department cannot give rise to a fiduciary breach, it cannot support an anti-inurement claim.

Additionally, in *Hutchins* and *Barragan*, the courts rejected the same "debt" argument Matula advances here, explaining that courts have precluded employers from using plan assets to satisfy "outstanding and unpaid amounts owed by the defendants," not future contributions. *Hutchins*, 2024 WL 3049456 at *9; *Barragan*, 2024 WL 5165330, at *6, n.9. The *Hutchins* court went on to state that "Plaintiff's attempt to analogize HP's future obligation to provide matching benefits to a debt is based on a distinction between 'new money' that HP contributes to the Plan as matching contributions and 'old money' that HP has already contributed to the Plan that is without support in the terms of the Plan, the text of ERISA, or case law." *Id*.

The distinction between delinquent and future obligations is particularly applicable here. As Matula concedes (ECF No. 46 at 2), under the Plan, the employer's contribution obligation does not come due until the end of the Plan Year (*i.e.*, the end of the calendar year) (ECF No. 40-2 at §§ 2.38, 5.1(d)). Under section 6.5 of the Plan, forfeitures must be used in the same calendar year in which they are forfeited. The combination of these requirements establishes that forfeitures are used to satisfy a future obligation, not an outstanding debt.

## C.    The Complaint Fails To State A Prohibited Transaction Claim.

In response to Defendants' argument that his prohibited transaction claim should be dismissed because the reallocation of forfeitures to pay benefits does not constitute a "transaction" let alone one prohibited by ERISA section 406 (ECF No. 38 at 24-25),

Matula relies again on the *Qualcomm* and *Intuit* decisions (ECF No. 46 at 19-20). For the reasons stated above, *supra* at 11-12, these two decisions are distinguishable.

This Court should not, in any event, follow these two decisions because, as confirmed by the majority of other courts to have considered the issue, they extend ERISA section 406 beyond its intended scope, which the Supreme Court in *Lockheed Corp. v. Spink*, 517 U.S. 882 (1996) described as precluding "commercial bargains" putting the plan at risk, not the funding of benefits. *See Hutchins*, 2024 WL 3049456, at *9 (emphasizing that allocation of forfeitures are not akin to "commercial bargains that present a special risk of plan underfunding"); *Dimou*, 2024 WL 4508450, at *11 ("An intra-plan transaction, like forfeiture reallocation, is unlike a sale or leasing of property to a third party" and does "not implicate a prohibited transaction."); *McManus*, 2024 WL 4944363 at *7 (dismissing claims, reasoning that "forfeited amount transfers are intra-plan transfers, and not prohibited inter-plan transfer[s]"); *Barragan*, 2024 WL 5165330 at *6-7 (dismissing claims because assets remained in the plan and reallocation did not pose special risk of underfunding).

### D.    The Complaint Fails To State A Duty to Monitor Claim.

Matula does not dispute that, if his breach of fiduciary duty claim is dismissed, then Count IV of his Complaint, lodged against Wells Fargo for allegedly failing to monitor the Human Resources Committee of the Board of Directors and Employee

Benefit Review Committee, should also be dismissed because it is a derivative claim. (ECF No. 30 at ¶¶ 55-59.)

### III.    MATULA'S CLAIMS ARE BARRED BY A RELEASE

As Defendants discussed in their Moving Brief (ECF No. 38 at 16), Matula's claims are independently dismissible because they were released. Matula does not dispute that he knowingly and voluntarily signed a release of claims in exchange for severance pay, but he advances two reasons why that release does not apply here, both of which lack merit. (ECF No. 46 at 22-24.)

First, his position that the release does not extend to ERISA claims because ERISA is not expressly mentioned in the release has been rejected by numerous courts, including the cases cited by Defendants in their Moving Brief. (ECF No. 38 at 17.)[6] The fact that Matula's release includes a carve-out for claims for his "vested interest in any employee benefit plan maintained by the Company" (ECF No. 39-2 at 2), if anything, makes Defendants' point that the release extends to ERISA claims, since there would be no reason for the carve-out if the release did not encompass ERISA claims.

To be clear, the carve-out does not apply here, since Matula is not making a claim to enforce a "vested interest" under the Plan's terms, but rather has brought statutory

---

[6] Contrary to Matula's assertion (ECF No. 46 at 23), there is no basis upon which to distinguish *Stanley v. George Washington Univ.*, 394 F. Supp. 3d 97, 107 (D.D.C. 2019), *aff'd*, 801 F. App'x 792 (D.C. Cir. 2020), because, like the release in *Stanley*, here, Matula's release extends to "all claims." (ECF No. 39-2 at 1.) The reference to claims "arising under federal . . . law" is merely illustrative, but, in any event, is properly read to apply to all claims and not just ones for "discrimination or harassment," as Matula contends.

16

claims seeking enhanced benefits allegedly lost due to a breach. The court in *Stanley* distinguished between these two types of claims when affirming the dismissal of an analogous statutory claim, agreeing that the statutory claim was released and did not fall within a similarly worded carve-out clause for claims for vested benefits. 394 F. Supp. 3d at 107-111. *See also Howell v. Motorola, Inc.*, 633 F.3d 552, 560-61 (7th Cir. 2011) (same). Dismissal here is even more compelling since Matula is suing to receive employer matching contributions that were *unvested*—and thus forfeited—by the participants who initially received them, let alone participants who have no right to them. His claims thus fall squarely within the plain language of the release and are not saved by the carve-out.

Second, Matula maintains that the release cannot extend to his current lawsuit because his claims are brought derivatively on behalf of the Plan under ERISA section 502(a)(2). (ECF No. 46 at 23-24.) While the law may preclude participants from releasing an ERISA plan's claims or rights, nothing prohibits an individual (like Matula) from waiving *his individual* right to sue on behalf of the ERISA plan. *Innis v. Bankers Tr. Co. of S.D.*, 2019 WL 2714509, at *3, 8, 12 (S.D. Iowa Apr. 30, 2019) (concluding that release waived plaintiff's right to sue, without impacting plan's rights). *See also Stanley v. George Washington Univ.*, 394 F. Supp. 3d 97, 109 n.10 (D.D.C. 2019), *aff'd*, 801 F. App'x 792 (D.C. Cir. 2020) (affirming dismissal of "fiduciary breach claims brought on behalf of the plan" as released); *Howell*, 633 F.3d at 560-61 (concluding that plaintiff's release waived his right to bring claim for plan under ERISA section 502(a)(2)); *Russell v. Harman Int'l Indus., Inc.*, 945 F. Supp. 2d 68, 79-80 (D.D.C. 2013) (same), *aff'd*, 773

17

F.3d 253 (D.C. Cir. 2014). None of the cases Matula cites (ECF No. 46 at 23-24) apply here since most examine the very different question of whether a plaintiff who signed a release can represent a class seeking plan losses under Federal Rule 23. *Innis*, 2019 WL 2714509, at \*10 (distinguishing class certification cases).

In sum, this Court should hold that Matula released the claims he purports to assert. He received valuable consideration in exchange for a broad release of "any claims," the validity of which he has not challenged.

## IV.    MATULA'S REQUEST FOR LEAVE TO AMEND SHOULD BE DENIED.

Lastly, Matula requests leave to amend any claim the Court concludes is deficient. (ECF No. 46 at 24.) His failure to append a proposed amended complaint is reason to reject the request. *Matousek*, 51 F.4th at 282-83; D. Minn. L. R. 15.1(b). His request should also be denied because it is futile. *See, e.g.*, *MM & S Fin., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 364 F.3d 908, 909-10 (8th Cir. 2004). In light of the Plan's mandate that forfeitures be used to offset future employer contributions, there is no additional fact Matula can plead that would afford him Article III standing or render his claims plausible.

## **CONCLUSION**

For the reasons discussed above and in Defendants' Moving Brief, this Court should grant Defendants' motion and dismiss the Complaint without leave to replead.

Dated: December 20, 2024          Respectfully submitted,

**PROSKAUER ROSE LLP**

By: */s/ Russell L. Hirschhorn* _____
Russell L. Hirschhorn (*pro hac vice*)
Deidre A. Grossman (*pro hac vice*)
Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3286
Facsimile: (212) 969-2900
rhirschhorn@proskauer.com
dagrossman@proskauer.com


**FAEGRE DRINKER BIDDLE & REATH LLP**
Jeffrey P. Justman (#0390413)
Kiera K. Murphy (#0401027)
90 S. 7th St., Suite 2200
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
jeff.justman@faegredrinker.com
kiera.murphy@faegredrinker.com

*Attorneys for Defendants*